425 So.2d 887 (1983)
FIDELITY & DEPOSIT COMPANY OF MARYLAND
v.
CLOY CONSTRUCTION COMPANY, INC., et al.
COLEMAN OLDSMOBILE, INC.
v.
CLOY CONSTRUCTION COMPANY, INC., et al.
Nos. 82 CA 0205, 82 CA 0206.
Court of Appeal of Louisiana, First Circuit.
January 4, 1983.
*888 David S. Bell, Baton Rouge, for Fidelity & Deposit Co. of Maryland.
Robert L. Kleinpeter, Baton Rouge, for Coleman Oldsmobile, Inc.
John C. Miller, Baton Rouge, for Paul T. Stewart, Architect.
Martin C. Schroeder, Baton Rouge, for Cloy Const. Co., Inc., et al.
Before PONDER, SAVOIE and ELLIS, JJ.
SAVOIE, Judge.
These consolidated suits result from two contracts between Cloy Construction Company, Inc. (Cloy) and Coleman Oldsmobile, Inc. (Coleman).
The first contract was for the construction of the present Coleman Oldsmobile facility in Baton Rouge. The construction was to be performed in accordance with the plans and specifications prepared by Paul F. Stewart, the architect retained by Coleman. Cloy's performance on this contract was bonded by the Fidelity and Deposit Company of Maryland.
The second contract was an oral agreement. Under this contract, Cloy agreed to provide certain fill for the lot adjacent to the construction. This lot was also owned by Coleman.
At trial, Cloy sought the balance due on the construction project, the contract price for the fill and damages. Fidelity & Deposit sued for certain funds which it was required to expend as Cloy's surety. In addition, Coleman prayed for damages for alleged defective design and construction. Its primary complaint was over the deficiencies in the concrete driveways, parking lots and curbing.
The trial court rendered judgment: (1) in favor of Cloy and Fidelity & Deposit against Coleman for $32,565.00[1] (retainage on the construction contract) with legal interest thereon from June 12, 1974; (2) in favor of Cloy and against Coleman for $24,496.50 (cost of fill contract) with legal interest thereon from date of judicial demand; (3) in favor of Fidelity & Deposit and against Cloy, decreeing that the judgment rendered in favor of Fidelity & Deposit against Coleman (see (1)) to be superior in rank to and prime and be paid in preference and priority to any judgment herein in favor of Cloy; (4) in favor of Fidelity & Deposit and against Cloy, et al, in the sum *889 of $39,982.62 (payments expended as surety) with legal interest from date of judicial demand; (5) reserving to Fidelity & Deposit the right to its damages for costs and expenses of these lawsuits against Cloy, et al; (6) in favor of Coleman and against Cloy and Fidelity & Deposit for $14,800.00 plus 25% thereon (costs of repairs of parking lot and to replace curbing); (7) in favor of Paul Stewart, Inc. and Paul Stewart, individually and its insurer, dismissing with prejudice Coleman's claims.
Appeals were taken by Coleman, Cloy, and Fidelity & Deposit. In response to Coleman's appeal, Stewart answered and urged that the trial court's dismissal of Coleman's claims against it be affirmed.

COLEMAN
On appeal, Coleman sets forth three assignments of error.[2] Basically, Coleman argues that it not only failed to get a properly designed parking lot but failed to get a finished product installed in a good workmanlike manner.
This case is governed by L.S.A.-C.C. Art. 2769, which reads:
"If an undertaker fails to do the work he has contracted to do, or if he does not execute it in the manner and at the time he has agreed to do it, he shall be liable in damages for the losses that may ensue from this non-compliance with his contract."
Under this article, the owner's remedy in the presence of substantial compliance or performance is to allege and prove the nature and extent of the unfinished or defective work so as to reduce the amount of the judgment by the amount of the cost required to correct the defective work. G. Salvaggio & Co., Inc. v. Delta Heights, Inc., 277 So.2d 754 (La.App. 4th Cir.1973). The burden of proof in a case of this nature as to the defects and omissions on the part of the contractor and the cost of repairing and finishing them lies squarely upon the owners who claim defective work exists. G. Salvaggio & Co., Inc., supra.
The original plans and specifications required a slab constructed of four inches of concrete with wire mesh and curbing connected by dowels. Subsequently, the plans and specifications were changed to delete the requirement for wire mesh and to substitute five inches of concrete. Both Mr. Cloy and Mr. Stewart testified this was a cost-saving change. Further, Mr. Cloy suggested that the curbs be glued to the concrete, as opposed to being connected by dowels. Mr. Cloy testified this idea was orally approved by Mr. Stewart, the architect.
Several experts were called at trial to testify as to the manner in which the parking lot and curbs were constructed. All of the experts agreed that concrete will crack. Dr. Jerry Householder, testifying in Coleman's behalf, stated he would do the job differently but did not say that the present design of the lot was deficient. As to the curbing, he testified that Darweld-C, which was used to bond the curbing, was not a true epoxy. He was of the opinion that Darweld-C would not give the same type of results as dowel. Mr. Gonzales, another expert, concurred in Householder's findings.
Lawrence Farris stated that he patched about twelve areas (admitted deposition said eight areas) of the driveway because of cracking and curbing. He last patched the area three years ago. In that time, the largest area patched was 10' × 10'. The patched areas were those that were most trafficked.
Dean McKee testified in Cloy's behalf. He was of the opinion that a majority of the cracks were due to shrinkage. His tests indicated the concrete was of good strength and exceeded the specifications and strengths required by the contract. He felt it was sufficient for the lot. McKee stated that he would expect some ponding after eight years.
James Clary, called by Cloy, testified that the lot was comparable to other lots in the area of the same age. He stated the concrete looked good, the omission of the mesh *890 was not a design defect, and the lot was functional. He did not consider the ponding or cracking in the concrete to be excessive. As to the curbing, he stated that the dowels would have been better than using an epoxy. However, he stated that the Highway Department accepted epoxy as a bonding agent and, therefore, he would accept it, too. Mr. Clary went on to say that Darweld-C was not a true epoxy.
The foregoing testimony supports the trial court's conclusions and awards.
The trial court found that the parking lot and driveways had withstood the test of time. This was so despite evidence indicating some deficiencies relative to slab thickness and improper construction of the curbing. It noted that three years prior to trial, between 8-12 sections of concrete had been repaired, amounting to approximately 9600 square feet of the total parking area (188,000 square feet). With the exception of the repaired sections, the court opined that the parking lot had and continues to serve the purpose for which it was constructed. The court was convinced that the parking lot in question was comparable to any 8-year old parking lot in the area. In accordance with these findings, the lower court awarded the replacement cost of the repaired sections of the lot and the cost of completely re-doing the curbing.
Further, the experts' testimony refutes Coleman's contention that the parking lot was improperly designed. The general consensus of the experts was that a 5-inch concrete slab without wire mesh is an acceptable design for parking lots in this area. In addition, gluing was noted to be an acceptable method of bonding curbs. However, when laying curbs by this method, a true bonding agent is necessary. Therefore, the trial court was correct in dismissing Coleman's claim against Stewart.

FIDELITY & DEPOSIT COMPANY AND CLOY CONSTRUCTION
Fidelity & Deposit Company and Cloy Construction present five specifications of error on appeal. Fidelity & Deposit and Cloy contend that the trial court erred in:
(1) not awarding Cloy and Fidelity & Deposit interest on $107,545.00 from February 27, 1974 to June 12, 1974, and on $32,545.00 from June 12, 1974 until paid; (2) not awarding interest to Cloy from July 13, 1973 on $24,496.50 under the fill contract; (3) not awarding Cloy damages for breach of contract; (4) not holding Fidelity & Deposit (or Cloy) were released by the actions and inactions of Coleman and in not sustaining their affirmative defenses; (5) in awarding a money judgment to Coleman against Cloy and Fidelity & Deposit, concluding that Cloy did not perform.
With respect to these above claims, it should be noted that Cloy and Coleman entered into an agreement on June 12, 1974. Under this agreement, Cloy agreed to complete certain items in consideration of Coleman releasing $75,000.00 of the retainage and agreeing to release the remainder thereof upon Cloy's completion of the agreed upon work. It appears that the parties intended the $75,000.00 payment to satisfy the amount due to Cloy as of that date. Thus, by this subsequent agreement, Cloy waived its claim to the interest which may have accumulated until that time.
As to the interest to be paid on the remainder of the retainage ($32,565.00), L.S.A.-C.C. 1938 governs. This article provides that all debts bear legal interest from the time they become due unless stipulated otherwise. In this case, the agreement provided that the balance of the retainage would be paid when the items contained on the May 24, 1974 punch list were completed to the satisfaction of the architect. On November 19, 1974, Stewart wrote a letter to Cloy, with a copy to Coleman, stating that all the items had been completed. Therefore, the $32,545.00 became "due as stipulated" on November 19, 1974. The trial court rendered interest on this amount from June 12, 1974. This is incorrect. By agreement of the parties, this amount was not to be paid until the punch list items were completed. The date of that completion was November 19, 1974. This is the earliest date from which interest could run under the above noted article.
*891 Further, Cloy and Fidelity & Deposit argue that the trial court erred in awarding interest on the fill contract amount ($24,496.50) from the date of judicial demand rather than from July 13, 1973, the date of completion.
L.S.A.-C.C. 1938 provides that all debts shall bear interest at a certain rate from the time they become due, unless stipulated otherwise. L.S.A.-C.C. 1938 makes no mention of whether demand need be made. However, the legislative history of L.S.A.-C.C. 1938 indicates that when this article was introduced in 1870, it was the legislative intent to eliminate the requirement of putting the obligor in default for the accrual of interest on money debts. 2 S. Litvinoff, Obligations § 244 in 7 Louisiana Civil Law Treatise, 457 (1975). Furthermore, under L.S.A.-C.C. 1935 the obligee, whatever his loss may be, cannot recover more than interest. Thus, it is fair that such a minimum recovery be allowed from the time the obligation is due without any putting of the obligor in default. Of course, an obligation to pay a sum of money is due at the arrival of the term expressly provided in the agreement. Litvinoff, supra, at 458. "If a term is neither expressed nor implied, a demand by the obligee becomes necessary to make the obligor aware that he is now expected to perform. In such a situation a mere amicable request should suffice .... Thus, a debt for professional services is due upon completion of the services and interest runs from the date a bill is rendered." Litvinoff, supra, at 458, 459.
Mr. Cloy testified that the cost of the fill as agreed to by Coleman was for the amount of $30,000.00 or $1.75 per yard, whichever was less. He submitted a bill to Coleman in the amount of $24,496.50 for this work. This bill has not been paid. An affidavit executed by Mr. Cloy, which is also in the record, states that the obligation was completed on July 13, 1973. However, Exhibit "Stewart 7" dated January 25, 1974 is the only evidence reflecting the billing date to Coleman for the fill work.[3] Therefore, interest should be awarded from the date Coleman was billed, January 25, 1974.
Thirdly, it is argued that the trial court erred in denying Cloy damages for breach of contract. In support thereof, Cloy contends L.S.A.-C.C. 1934 is controlling. That article provides for the measure of damages for breach of a contract "where the object of the contract is anything but the payment of money." L.S.A.-C.C. 1934. (Emphasis added). Cloy's complaint is that Coleman breached its contract by failing to pay timely. Therefore, L.S.A.-C.C. 1934 is inapplicable. A complaint of this type is governed by L.S.A.-C.C. 1935, which reads:
"Art. 1935. Interest as damages for non-payment of money. The damages due for delay in the performance of an obligation to pay money are called interest. The creditor is entitled to these damages without proving any loss, and whatever loss he may have suffered he can recover no more." (Emphasis added).
Therefore, this contention is without merit.
Further, in their supplemental brief, Cloy and Fidelity & Deposit contend that L.S.A.-C.C. 1935 denies equal protection of the law violating both the Louisiana Constitution and the United States Constitution. The basis for such assertion is that L.S.A.-C.C. 2765 allows a contractor to recover damages when his contract has been cancelled but L.S.A.-C.C. 1935 limits recovery of a completed contract to interest. It is claimed this results in an invidious discrimination, without a reasonable basis, and is arbitrary. This argument is totally without merit. The articles contemplate two entirely different situations. L.S.A.-C.C. 1935 *892 provides for the measure of damages when a person fails to pay a money debt. In contrast, L.S.A.-C.C. 2765 provides for the right of a proprietor to cancel at his pleasure, the bargain he has made. However, the exercise of this right will require the proprietor to pay the undertaker for the expenses and labor already incurred, and such damages as the nature of the case may require. This is not a case where two persons in the same situation are treated differently under the law. It is a case where two persons in two entirely different situations are treated differently under the law. As such, there is no violation of the equal protection clause of either constitution.
Cloy and Fidelity & Deposit also contend that each was released under the June 12, 1974 agreement for any deficiencies under the original contract that were not reserved. Cloy argues the defenses of compromise, novation and remission apply. Fidelity & Deposit argues that it was released by the design changes made in the project and by the July 12th agreement to which it was not a party.
The evidence does not support Cloy and Fidelity & Deposit's contention on this issue. The compromise of June 12, 1974, was not a general compromise of all differences as contemplated under Article 3083 of the Civil Code but was, rather, a compromise or transaction of very limited scope under Article 3073 of the Civil Code. This compromise only extended the time in which Cloy was to perform certain acts and Coleman was to pay certain funds. The trial court did not and we do not find any intention to enter into a general compromise or to extend this compromise beyond the resolution of differences mentioned in that agreement.
L.S.A.-C.C. 2185 defines a novation as a contract consisting of two stipulations: One, to extinguish an existing obligation, the other, to substitute a new one in its place. The terms of the agreement do not extinguish the existing obligations of the parties nor does it substitute a new obligation in its place. Thus, this argument is without merit.
A remission is defined in Civil Law as a release of the debt. See Black's Law Dictionary, 1458 (Revised 4th ed. 1968). The agreement does not indicate that Coleman released Cloy from its obligations under the contract. Therefore, this argument is also without merit.
Fidelity & Deposit asserts that it was discharged from its obligations of suretyship in two ways. First, that changes in the plans and specifications operated to release Fidelity & Deposit by the certain provisions of the bond. The record does not support this contention. The trial court did not so find nor do we. Second, Fidelity & Deposit asserts that it was discharged because it was not a party to the agreement of July 12, 1974. L.S.A.-C.C. 3061 provides that the surety is discharged when by the act of the creditor, the subrogation of his rights, mortgages and privileges can no longer be operated in favor of the surety. There is no showing that Fidelity & Deposit was so prejudiced by the July 12, 1974 agreement. This argument is also without merit.
Lastly, Cloy and Fidelity & Deposit contend the lower court erred in concluding Cloy did not perform under the contract provisions, and awarding Coleman damages therefor.
The trial court concluded that the work in question had some deficiencies relative to thickness of the slab and that the curbing was constructed in an improper manner. Cloy argues that any defect in the lot and curbing is due to the design thereof. This is not supported by the record.
It appears that the defective curbing resulted from Cloy's failure to use a true epoxy, not from the fact that it was glued. Further, the record does not show that Stewart particularly approved the use of Darweld-C but only agreed to allow the curbing to be glued. The use of Darweld-C was Cloy's decision. Thus, the trial court was not manifestly erroneous in its conclusion.
Under this assignment of error, Cloy also argues that the amount of damages awarded *893 hereunder is excessive. Cloy contends that the figures given were the cost of re-doing the work in a different manner.
The owner's remedy, in the event of defects or imperfection upon substantial completion of the work, is the right to seek a diminution in the price by the amount of the cost required to correct the defective work. G. Salvaggio & Co., Inc., supra.
Dr. Householder was the only witness to testify as to the cost of replacing the twelve defective sections of the concrete and the curbing. The trial court accepted these figures as being the true cost of repairs. We find no manifest error in this conclusion by the trial court.
For the foregoing reasons, the decision of the trial court is amended, as follows:
1. The judgment of the trial court in favor of Cloy Construction Company, Inc. and Fidelity & Deposit Company of Maryland and against Coleman Oldsmobile, Inc., in the amount of $32,565.00 is amended to read "in the amount of $32,545.00"[4] and is to bear interest from November 19, 1974.
2. The judgment of the trial court in favor of Cloy Construction Company, Inc. and against Coleman Oldsmobile, Inc. in the amount of $24,496.50 is to bear interest from January 25, 1974.
In all other respects, the judgment of the trial court is affirmed.
Costs of this appeal are to be shared equally by Cloy Construction Company, Inc. and Coleman Oldsmobile, Inc.
AMENDED AND AFFIRMED.
NOTES
[1] This $32,565.00 figure is supposed to represent the retainage due on the construction contract for the Coleman Oldsmobile facility. However, the architect's letter of November 19, 1974 reflects that the balance due thereon is $32,545.00. This figure was derived from the total retainage amount $107,545.00 minus the $75,000.00 paid under the compromise agreement of June 12, 1974. We note this subtraction error and will amend the trial court's judgment accordingly.
[2] See footnote 1.
[3] Coleman argues the lower court erred in three respects: (1) in failing to conclude that the concrete parking area and driveways were defective, had failed, and that this resulted from improper design, poor supervision, and faulty construction; (2) in failing to conclude that the contractor was at fault in not following the plans and specifications requiring five inches of concrete and for his further failure to perform in a good workmanlike manner considering his knowledge and expertise; (3) in concluding that the architect was not responsible for engineering defects in design and construction under the doctrine of respondeat superior.
[4] Exhibit "Stewart # 7" contains Invoice No. 087 from Cloy Construction Company to Mr. Bob Coleman, c/o Coleman Oldsmobile, Inc. for fill and grade work at the Coleman Toyota site for 13,996 cubic yards $1.75 per yard, totalling $24,496.50. This invoice is dated January 16, 1974. However, it was forwarded to Coleman by Paul Stewart, architect, in his letter dated January 25, 1974. Therefore, January 25, 1974 is the billing date of record.